UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EMILLE GRACE MERCER ROBINSON, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. 1:17-cv-2071 (TSC) |
| ) | |
| PANERA, LLC, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Plaintiff Emille Grace Mercer Robinson brings this action against Defendant Panera, LLC, alleging that Panera's negligence caused her to fall in one of Panera's restaurants.

Defendant moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment. (ECF No. 18.) It has also filed a motion *in limine* to exclude Plaintiff's proposed expert testimony. (ECF No. 19.) Plaintiff moves to file a surreply to Defendant's summary judgment motion (ECF No. 27) and to file a surreply to Defendant's motion *in limine* (ECF No. 26).

For the reasons set forth below, the court will DENY Plaintiff's motions to file a surreply, GRANT Defendant's motion *in limine*, and GRANT Defendant's motion for summary judgment.

## I. BACKGROUND[1]

On February 11, 2016, there was snow on the ground "[i]n some places" in Washington, D.C. because it had snowed earlier in the week. (ECF No. 22-4 ("Robinson Dep.") at 9:8–16.) At some point that day, Plaintiff entered the Panera located at 1750 H Street, NW, Washington, D.C. (Robinson Dep.

---

[1] Where possible, the following facts are taken from the parties' Local Rule 7(h)(1) Statement. (ECF Nos. 18-1, 22.) The other facts are taken either from the deposition transcripts or the expert report. Where Plaintiff has elected not to respond to Defendant's proffered fact, the court deems the fact to be true, if supported by record evidence.

1

at 7:23–8:13.) Although there were mats on the floor near the entryway due to the icy weather, Plaintiff does not recall noticing anything about the condition of the floor mats. (*Id.* at 10:11–24; ECF No. 18-1 ("Def.'s 7(h)(1) Statement") at ¶ 4; ECF No. 22 ("Pl.'s 7(h)(1) Statement") at ¶ 4; ECF No. 22-2 ("Mansaray Dep.") at 23:13–17.) But she thinks that "if the mat had been buckled . . . or something like that," she would have noticed. (Robinson Dep. at 19:21–20:12.) Plaintiff then ordered "a latte and some type of pastry." (*Id.* at 11:2–3.)

Once Plaintiff received her order, she began to leave Panera with the latte in one hand and the pastry in the other. (*Id.* at 17:9–15.) As she approached the exit, and while looking straight ahead, Plaintiff felt the edge of her right boot catch either under the end of the mat or at the front edge of the mat. (*Id.* at 17:16–22, 18:12–22, 19:13–20; Def.'s 7(h)(1) Statement at ¶ 4; Pl.'s 7(h)(1) Statement at ¶ 4.) She fell and tore her left rotator cuff. (Robinson Dep. at 17:22–25, 28:21–29:1.) After she fell, Plaintiff did not notice anything about the mat's condition (*e.g.*, it was neither frayed nor flipped over). (*Id.* at 19:21–21:4; Def.'s 7(h)(1) Statement at ¶ 5; Pl.'s 7(h)(1) Statement at ¶ 5.) She does not know why her boot caught the edge of the mat, but assumes it was because the mat was not tacked down to the floor. (Robinson Dep. at 20:13–21:18; Def.'s 7(h)(1) Statement at ¶ 6; Pl.'s 7(h)(1) Statement at ¶ 6.)

Defendant directs the court to several facts in the record relating to Plaintiff's fall. First, Plaintiff did not notice anything unusual about the mat either before or after her fall. (Robinson Dep. at 20:13–16; Def.'s 7(h)(1) Statement at ¶ 5; Pl.'s 7(h)(1) Statement at ¶ 5.) Second, as she exited the store, Plaintiff never looked down but continued to look straight ahead. (Robinson Dep. at 19:13–20; Def.'s 7(h)(1) Statement at ¶ 3.) Third, Plaintiff does not "believe that there was any part of the mat that wasn't flat to the ground." (Robinson Dep. at 19:21–25; Def.'s 7(h)(1) Statement at ¶ 5; Pl.'s 7(h)(1) Statement at ¶ 5.) Fourth, Panera's manager examined the mat after Plaintiff's fall and observed that it laid "perfectly" on the floor. (ECF No. 18-3 ("Javed Dep.") at 40:14–41:6; Def.'s 7(h)(1) Statement at

¶ 10; Pl.'s 7(h)(1) Statement at ¶ 10.)  Fifth, Panera's assistant manager examined the mat after Plaintiff's fall and observed that it did not "move or budge or anything" and that the edges of the mat "were flat on the floor."  (Mansaray Dep. at 41:15–42:2; Def.'s 7(h)(1) Statement at ¶ 11; Pl.'s 7(h)(1) Statement at ¶ 11.)  Sixth, Plaintiff is not aware of any complaints reported to Panera about the mat's condition before her fall.  (Robinson Dep. at 21:22–25; Def.'s 7(h)(1) Statement at ¶ 8.)

Plaintiff retained an expert witness, Russell Kendzior, the Founder and Chairman of the Board of the National Floor Safety Institute ("NFSI"), and the President of Traction Experts, Inc.  (ECF 22-9 ("Expert's Experience") at 1.)  Kendzior is a certified NFSI Walkway Auditor, and a member of the American Society for Testing and Materials ("ASTM"), (*id.* at 2), an organization that maintains design and construction guidelines and minimum maintenance criteria concerning standard practices for managing safe walking surfaces, including the use of floor mats, (ECF 22-10 ("Standards")).

Kendzior reviewed (1) the depositions of Plaintiff, the manager, and the assistant manager; (2) answers to interrogatories; (3) the responses to Plaintiff's request for production and documents; (4) the D.C. Fire and EMS Report; (5) the Service Agreement and Amended Service Agreements between Panera and Aramark (the company that delivers new mats to Panera every Thursday);[2] (6) the Panera Employee Safety & Security Manual; and (7) Panera's surveillance video and photographs of the restaurant's entrance.  (ECF No. 21-7 ("Kendzior Dep.") at 8:11–9:3.)  Kendzior never spoke to Plaintiff, (*id.* at 21:11–12), never visited the Panera on H Street, (*id.* at 26:8–10), never saw or tested the mat at issue, (*id.* at 70:8–14), and never examined an exemplar of the mat at issue, (*id.* at 43:11–14).  He also testified that he worked based on "limited information, photographs . . . and videos that [did not] actually show the exact point of impact."  (*Id.* at 51:6–9.)

---

[2] (Mansaray Dep. at 13:20–15:14.)

Kendzior concluded that Plaintiff fell for one of two reasons: either the floor mat was "buckled or rippled or otherwise elevated above that of the floor level," or the mat's edge was at "the junction point where the walkway transitioned from a ramp to a level walking surface," which "creat[ed] a change in elevation between the two surfaces." (ECF 22-6 ("Kendzior Report") at 2.)

When asked for the basis of his first reason, Kendzior replied:

> Well, those—those are all possibilities. I—Ms. Robinson said with certainty that she caught the toe of her boot on the edge of the mat. I don't know. I wasn't there and I can't see that in the surveillance video. There was [sic] no eyewitnesses that can testify to that. So assuming, and taking her testimony at face value that what she said happened happened, well, what other possibilities could there have been, if any? If any. So it's the process of elimination.

(Kendzior Dep. at 45:15–46:4.) With respect to his conclusion that the mat might have been rippled or buckled, he acknowledged that Plaintiff testified that she did not see any kind of buckling or rippling, and he did not provide "[a]ny other factual basis" for that portion of his opinion. (*Id.* at 46:12–48:18.) And with respect to his conclusion that the mat might have been "otherwise elevated above that of the floor level," he explained by comparing the "nose"[3] on carpeted stairs to the mat-covered junction point (where the ramp met the level surface). (*Id.* at 48:19–50:4.) While the carpet and mat are flat, there is necessarily "a hump" over each curve. (*Id.* at 49:7–50:4.)

When asked for the basis of his second reason, Kendzior clarified that when referring to the "change in elevation," it was not the mat that changed in elevation, but the floor, going from a ramp to a flat floor. (*Id.* at 55:14–56:4.)

Kendzior testified that the height of the mat—one-eighth of an inch thick—did not violate any standards. (*Id.* at 42:5–18.) He also stated that there was no standard of which he was aware

---

[3] The nose of a stair is located at the edge or point where the vertical section meets the horizontal section above it.

recommending that a mat not be placed over a transition where there is a change in elevation. (*Id.* at 74:22–75:9.) According to Kendzior, "Panera Bread can do whatever they want. They can do—there's no law against using a floor mat the way they did." (*Id.* at 75:9–11.) However, in Kendzior's opinion, it was "not reasonable to use a mat like they did in this particular application without securing it to the floor," and the best solution would have been to not use any floor mat on the ramp. (*Id.* at 86:11–87:4.)

At the time Kendzior made his report and came to his conclusions, he had only evaluated the surveillance video from one angle, directed at the exit; he had not reviewed the surveillance video from the camera which captured a wider view of the exit and store. (*Id.* at 9:12–17, 10:4–18.) He testified that his review of the second surveillance video did not alter his opinion, except that the mat was shorter than he initially believed from reviewing deposition testimony. (*Id.* at 10:21–11:19, 30:13–20.)

## II. LEGAL STANDARD

Summary judgment is appropriate where there is no disputed genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). There is a genuine issue when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

In determining whether a genuine issue of material fact exists, the court must view all the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party "may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."

5

*Anderson*, 476 U.S. at 248 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

## III. ANALYSIS

### A. <u>Plaintiff's Motions for Leave to File A Surreply</u>

Plaintiff has filed two motions seeking leave to submit surreplies in connection with Defendant's motion to exclude the proposed expert testimony (ECF No. 26 ("Pl.'s Mot. Surreply Expert Testimony")), and Defendant's motion for summary judgment (ECF No. 27 ("Pl.'s Mot. Surreply Summ. J.")). Defendant opposes each motion in a single brief. (ECF No. 28 ("Def.'s Opp'n").)

With respect to filing a surreply, the court in *Glass v. Lahood* noted:

> The Local Rules of this Court contemplate that there ordinarily will be at most three memoranda associated with any given motion: (i) the movant's opening memorandum; (ii) the non-movant's opposition; and (iii) the movant's reply. *See* LCvR 7. Nonetheless, when the non-movant is deprived of the opportunity to contest matters raised for the first time in the movant's reply, the non-movant may seek the district court's leave to file a surreply.

786 F. Supp. 2d 189, 230 (D.D.C. 2011), *aff'd*, No. 11-5144, 2011 WL 6759550 (D.C. Cir. Dec. 8, 2011). "Surreplies are generally disfavored, and the determination of whether to grant or deny leave is entrusted to the sound discretion of the district court." *Crummey v. Soc. Sec. Admin.*, 794 F. Supp. 2d 46, 62 (D.D.C. 2011), *aff'd*, No. 11-5231, 2012 WL 556317 (D.C. Cir. Feb. 6, 2012) (internal citations omitted). In exercising its discretion to ensure that briefing does not become an "endless pursuit," *id.* at 63, courts consider three factors: "whether the movant's reply in fact raises arguments or issues for the first time; whether the non-movant's proposed surreply would be helpful to the resolution of the pending motion; and whether the movant would be unduly prejudiced were leave to be granted," *Glass*, 786 F. Supp. 2d at 231. Importantly, a surreply is unnecessary where it serves only to amplify an issue already addressed in briefing, *id.*, or to correct an opposing party's "alleged mischaracterization," *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001). "Where the movant's reply does not expand the scope

6

of the issues presented, leave to file a surreply will rarely be appropriate." *Crummey*, 794 F. Supp. 2d at 63.

1. <u>Plaintiff's motion to file a surreply in connection with Defendant's motion to exclude proposed expert testimony</u>

Plaintiff contends that she should be permitted to file a surreply to address "two new arguments" that Defendant raised in its reply brief: first, that "the video surveillance of the incident shows that the mat was flat to the ground" and second, that "even a secure mat would not be flush with the ground and would present a potential tripping hazard if one is not looking where they step." (Pl.'s Mot. Surreply Expert Testimony at 1–2.) Defendant maintains that a surreply is inappropriate because "[t]he condition of the mat at the time of the fall, and Plaintiff's contributory negligence in failing to exercise reasonable care for her own safety, were addressed in detail in the previously-filed briefs." (Def.'s Opp'n at 3.) The court agrees with Defendant.

As noted above, a surreply is inappropriate to amplify issues already addressed in briefing. In Plaintiff's opposition to Defendant's motion *in limine* to exclude Kendzior's testimony, she noted the sole issue is "whether Mr. Kendzior has a sufficient factual basis for stating that the floor mat caused Plaintiff's fall" and asserted that "Mr. Kendzior has a valid basis for his opinions." (ECF No. 21 ("Pl.'s Opp'n Expert Testimony") at 1.) The two arguments Plaintiff seeks to rebut are not new and are squarely within the scope of Defendant's initial attack on the foundation for Kendzior's opinion. In addition, Plaintiff's proposed surreply would not be helpful to the court in resolving Defendant's motion, as it merely reiterates what is already in the record. For example, Plaintiff seeks to highlight that the video does not depict the edge of the mat, (ECF No. 26-1 ("Pl.'s Proposed Expert Testimony Surreply" at 1), but Defendant's motion *in limine* acknowledges that fact, (ECF No. 19-1 ("Def.'s Mot. to Exclude Expert Testimony") at 4), and the court has viewed both videos. Finally, although Defendant

would not be prejudiced by the surreply because it is not helpful, the other factors counsel this court to exercise its discretion to deny this motion.

2. <u>Plaintiff's motion to file a surreply in connection with Defendant's motion for summary judgment</u>

Plaintiff seeks to file a surreply that "distinguishes [an] authority" that Defendant referenced in its brief and "raises no new arguments." (Pl.'s Mot. Surreply Summ. J. at 2.) In her proposed surreply, she notes that Defendant "misstates" the ruling in *Martin v. Omni Hotels Mgmt. Corp.*, 206 F. Supp. 3d 115 (D.D.C. 2016). (ECF No. 27-1 ("Pl.'s Proposed Summ. J. Surreply") at 1.) Defendant argues that a surreply is not justified to correct a mischaracterization. (Def.'s Opp'n at 2.) Here again, the court agrees with Defendant.

As noted earlier, a surreply is not warranted where a party seeks to correct an opposing party's "alleged mischaracterization." *Lewis*, 154 F. Supp. 2d at 61. Plaintiff admits that her intent is to address Defendant's misrepresentation of a case. Moreover, Defendant's use of the case cannot properly be considered a new argument where both Plaintiff and Defendant had access to the case for the entire time this case has been pending, and Plaintiff could have distinguished the case in her opposition to Defendant's motion. In addition, given that interpreting case law is within the province of this court, Plaintiff's surreply recharacterizing the authority would not be helpful. Although Defendant would not be prejudiced by the surreply, Plaintiff's attempt to use the surreply as a vehicle to correct an alleged mischaracterization is improper and unnecessary, and the court will exercise its discretion to deny the motion.

B. **<u>Defendant's Motion to Exclude Expert Testimony</u>**

Defendant moves to exclude Kendzior's testimony regarding his opinions on the cause of Plaintiff's fall because they are "speculative, not supported by the undisputed facts of this case, and

8

invade the province of the jury." (Def.'s Mot. To Exclude Expert Testimony at 2.) Plaintiff opposes Defendant's motion and contends that "Kendzior has a valid basis for his opinions." (Pl.'s Opp'n Expert Testimony at 1.) Having reviewed the record, along with the parties' submissions, the court agrees with Defendant that Kendzior's opinion on the cause of Plaintiff's fall is not supported by factual evidence in the record.

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. District courts have "broad discretion in determining whether to admit or exclude expert testimony." *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 895 (D.C. Cir. 2010) (quoting *United States v. Gatling*, 96 F.3d 1511, 1523 (D.C. Cir. 1996)). "A court 'must be cautious—except when defects are obvious on the face of a proffer—not to exclude debatable scientific evidence [at summary judgment] without affording the proponent of the evidence adequate opportunity to defend its admissibility.'" *Walen v. United States*, No. 15-cv-1718, 2019 WL 4261160, at *14 (D.D.C. Sept. 9, 2019) (alteration in original) (quoting *Cortés-Irizarry v. Corporación Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997)). However, the court must act as a gatekeeper and "may only admit expert testimony if it is both relevant and reliable." *Heller v. District of Columbia*, 952 F. Supp. 2d 133, 139 (D.D.C. 2013).

Here, Kendzior's opinions can be broken down into three separate theories, each of which he has failed to adequately support with factual evidence in the record.

9

The first theory is that Plaintiff fell because "the edge of a floor mat [was] buckled or rippled." (Kendzior Report at 2.) However, there is no evidence in the record that the mat was buckled or rippled. Kendzior reviewed deposition testimony, video surveillance, and photographs. He acknowledged that Plaintiff testified that she did not observe any buckling or rippling in the mat. (Kendzior Dep. at 46:12–18.) And when asked to point to anything in the surveillance video, photographs, or Plaintiff's testimony that would support the theory that the mat was buckled or rippled, Kendzior responded, "[w]ell, we don't know. She didn't—she didn't know. But she tripped on the mat. We know that. . . . was it a buckle, a curl, a ripple, a hump, an elevated edge, those are all possibilities. We—we —I can't, with certainty, say it was any one of those." (*Id.* at 48:6–17.) In addition, Plaintiff testified that the mat was flat to the ground and that she would have noticed if it was buckled, but she did not. (Robinson Dep. at 19:23–20:4.) In opining that the cause of Plaintiff's fall was that the edge of the floor mat was buckled or rippled, Kendzior contradicts Plaintiff's testimony and the record evidence, and he does not adequately set forth how his theory can co-exist with the record evidence. Put simply, Kendzior has not established that his theory that the mat was buckled or rippled is based on sufficient facts.

Kendzior's other two theories have the same factual predicate and suffer from the same deficiency. His second and third theories are that Plaintiff might have fallen because the mat was "otherwise elevated above that of the floor level" or "the edge of the mat was at the junction point where the walkway transitioned from a ramp to a level walking surface thus creating a change in elevation between the two surfaces." (Kendzior Report at 2.) The court groups these theories together because both involve the junction where the ramp meets the level floor. With regard to the second theory, Kendzior testified that "otherwise elevated" referred to the mat-covered junction point, (Kendzior Dep. at 48:19–50:4), and his third theory is that the mat's edge was at the junction point. These two theories fall together because although Kendzior vacillated on whether Plaintiff fell before the junction point or

at the junction point,[4] it is uncontroverted that (1) the edge of the mat was not at the junction point (as the junction point was covered by the mat),[5] and (2) Plaintiff fell at the front edge of the mat.[6] Therefore, while it may be true that the placement of the mat in relation to the junction point did present a hazard, Kendzior has not provided a factual basis for his opinion on the junction point's role in the fall because the evidence is undisputed that Plaintiff fell before she reached the junction point.

Having found that Kendzior's opinions are unsupported by the facts, the court will therefore grant Defendant's motion, and preclude Kendzior's opinion testimony as to the cause of Plaintiff's fall. In addition, in assessing the merits of Defendant's summary judgment motion, the court will not consider Kendzior's opinions as to the cause of the fall.[7]

---

[4] (*Compare* Kendzior Dep. at 41:6–10 ("Q: . . . the point you would say that she fell there, that would be past the junction point . . . isn't that right? A: Yes.") *with id.* at 51:3–6 ("Q: . . . even assuming that were the case, the area where the mat—where the transition—wasn't the area where Ms. Robinson fell? A: I don't know.")

[5] (*See e.g.*, Pl.'s Opp'n Expert Testimony at 16 ("Mr. Kendzior explained that whether the mat ended at the area where the ramp met the level floor *or ended in the middle of the ramp, which is what happened here.* . .") (emphasis added).)

[6] Kendzior testified that, from his perspective, the edge of the mat could be the top or side edge, (Kendzior Dep. at 23:13–21), but this contradicts Plaintiff's testimony that her foot connected with the front edge, (*id.*; Robinson Dep. at 18:12–22).

[7] Kendzior's opinion is heavily grounded in conjecture because he relied almost exclusively on Plaintiff's deposition and admitted that he has no way to narrow down the possibilities of the cause of her fall. (*See, e.g.*, Kendzior Dep. at 22:17–23:8–12 ("Q: What's the basis for your understanding that the—that her toe may have caught on the top surface of the carpet mat, as opposed to the edge? . . . A: . . . Ms. Robinson—I don't want to put words in her mouth. She didn't state with certainty what happened other than she caught the toe of her boot on the edge of the mat. And so it's—I'm including both possibilities."); *id.* at 86:4–6 (Kendzior: "What I guess you can say was speculation is what specifically about the mat created an unreasonably dangerous condition.").)

### C. Defendant's Motion for Summary Judgment

"To succeed in a negligence action under District of Columbia law, the plaintiff 'bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Martin*, 206 F. Supp. 3d at 121 (internal quotation marks omitted) (quoting *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988).

In the District of Columbia, the only standard of care owed to those on a landowner's property is "reasonable care under the circumstances." *Frazza v. United States*, 529 F. Supp. 2d 61, 69 (D.D.C. 2008) (quoting *Sandoe v. Lefta Assocs.*, 559 A.2d 732, 742 (D.C. 1989)). Therefore, a plaintiff claiming negligence must establish what constitutes "reasonable care" under the specific circumstances of the case. *Id.* "Pursuant to the 'expert testimony requirement,' '[a] plaintiff must put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson.'" *Briggs v. Washington Metro. Area Transit Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007) (quoting *District of Columbia v. Hampton*, 666 A.2d 30, 35–36 (D.C. 1995), *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000)). However, where "the subject matter is within the realm of common knowledge and everyday experience," no expert testimony is required. *Id.* (quoting *Hampton*, 666 A.2d at 35, *Hill v. Metro. African Methodist Episcopal Church*, 779 A.2d 906, 908 (D.C. 2001)).

Defendant argues that Plaintiff has not identified a duty or standard of care with which Defendant failed to comply. (*See* ECF No. 18-1 ("Def.'s Mot. Summ. J.") at 7, 10 ("There is no evidence that the mat was in a poor condition or represented any kind of tripping hazard . . . . There is no evidence of any hazardous condition of the floor mat.").) Plaintiff, relying solely on Kendzior's testimony, contends that Defendant had a duty to further secure the rubber-backed mat or remove it

entirely.[8] (ECF No. 22 ("Pl.'s Opp'n Summ. J.") at 15–18.) However, Plaintiff has not established that Defendant owed her that standard of care under the circumstances.

In *Martin v. Omni Hotels*, the plaintiff sued Omni for negligence after she tripped on a mat and fell in the lobby of the Omni Shoreham Hotel. 206 F. Supp. 3d at 117. She claimed that the mat was wrinkled and caused her fall. *Id.* She retained an expert witness on the specific standards for using floor mats in a manner that avoids creating trip hazards. *Id.* at 118. In determining the standard of care owed by Omni, the court noted that an expert must "at the very least," specify both "what standards were violated and how they were violated." *Id.* at 121 (quoting *Sullivan v. AboveNet Commc'ns, Inc.*, 112 A.3d 347, 357–58 (D.C. 2015)). "Mere '[g]eneralized references to national standards are insufficient to establish a standard upon which the defendant's actions can be measured.'" *Id.* The court noted that plaintiff's expert identified a specific standard—"[m]ats . . . shall not have wrinkles or other hazards that may cause trip occurrences"—that was "not statutorily required" but also "not optional." *Id.* at 121–22. The court concluded that the expert's testimony "provided sufficient information for a jury to conclude that the standard of care Omni owed to Ms. Martin at least required Omni to lay and maintain the mat in a safe, wrinkle-free condition." *Id.* at 122.

---

[8] Plaintiff also claims that she is entitled to an adverse inference because "Panera negligently failed to preserve important evidence that was in its possession which demonstrated the placement of the mat, the condition of the mat, and the status of the mat at the time of Plaintiff's fall." (ECF No. 22 ("Pl.'s Opp'n Summ. J.") at 12–13.) To receive an adverse inference, Plaintiff must show that: "(1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to [her] claims . . . to the extent that a reasonable factfinder could conclude that the lost evidence would have supported [her] claims." *Martin*, 206 F. Supp. 3d at 129 (quoting *D'Onofrio v. SFX Sports Grp., Inc.*, No. 06-cv-687, 2010 WL 3324964, at *6 (D.D.C. Aug. 24, 2010)). Plaintiff makes no attempt to establish factors one or three, and she cursorily states that Defendant was negligent. (*See* Pl.'s Opp'n Summ. J. at 12–13.) Therefore, she is not entitled to an adverse inference.

*Frazza v. United States* provides a contrast to *Omni*. 529 F. Supp. 2d 61. In *Frazza*, the plaintiff fell while on a photography assignment at the White House. *Id.* at 62. The plaintiff retained an expert witness to "testify as to the standard of care in building maintenance during inclement weather." *Id.* at 64. The expert then provided one standard of care tethered to a specific, written standard, and another based on his opinion. *Id.* at 64–67. In determining whether the plaintiff had established a standard of care, the court, relying on Circuit precedent, noted that expert testimony

> is not sufficient if it merely consists of the expert's opinion as to what he or she would do under similar circumstances. Nor is it enough for the expert simply to declare that the [defendant] violated the national standard of care. Rather, the expert must clearly articulate *and reference* a standard of care by which the defendant's actions can be measured.

*Id.* at 71 (quoting *Briggs*, 481 F.3d at 846 (emphasis in original)). The court had "no trouble" concluding that the written standard is the type of "'specific, articulable (and articulated) standard of care' that is required to prove negligence under District of Columbia law." *Id.* But it found that based on the evidence in the record, there was no basis on which a jury could find the standard had been violated without speculating as to conditions that had not been factually established. *Id.* at 72–73 ("Plaintiffs cannot demonstrate that Mr. Frazza's fall was caused by Defendant's breach of the relevant standard of care."). And with respect to the expert's proffered standard of care based on his "experience" and general "observations," the court found that it did not constitute a "specific, articulable (and articulated) standard of care" because the expert did not "establish a standard of care that is related either to 'practices in fact generally' followed or 'to some standard that is nationally recognized.'" *Id.* at 73–74 (quoting *Nat'l Tel. Co-op. Ass'n v. Exxon Mobil Corp.*, 244 F.3d 153, 157 (D.C. Cir. 2001)) (internal alterations omitted). The expert's opinion as to what he would do in similar circumstances was insufficient to establish a relevant standard of care. *Id.* at 74 (citing *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997), *Levy v. Schnabel Found. Co.*, 584 A.2d 1251, 1255 (D.C. 1991)).

Here, Plaintiff argues that Defendant had a duty to further secure the rubber-backed mat.[9] Because the fall occurred before the junction point, the relevant question is whether Plaintiff has established a "specific, articulable (and articulated) standard of care" that required Defendant to further secure the mat on the ramp.

Attempting to answer this question in the affirmative, Plaintiff presents the court with five of "the most relevant standards and an explanation as to why they were violated." (Pl.'s Opp'n Summ. J. at 16–17.) However, as in *Frazza*, while some of the standards themselves are specific and articulable, based on the evidence in the record, a jury could not find that Defendant had a duty to ensure the mat was further secured on the ramp. One "standard" is not relevant because it is, in fact, a definition of the word "trip" and Plaintiff improperly attempts to convert an explanation of the definition into a standard. (*See id.* at 17 ("Section 3.36, Definition of a Trip").) Three standards are not relevant because when Kendzior described the manner in which they were violated, he included actions that must be taken when the mat is on a ramp, but these actions are not in the plain text of the standard. (*See id.* at 16–17 (mentioning Sections 5.4, 7.3. and 8.10.) Finally, the fifth standard is not relevant because it requires that the mat be secured if it "migrate[s] a considerable distance," (*see id.* at 17 (mentioning Section 8.8),

---

[9] Plaintiff argues that the applicable standard of care required Defendant to *either* further secure the mat *or* not use the mat at all. (*See* Pl.'s Opp'n Summ. J. at 15.) But the record is devoid of any articulable standard suggesting that, in snowy weather, no mat on a ramp is better than a rubber-backed mat on a ramp. Kendzior did state that "the best solution is don't use a floor mat. The floor mat in the particular case may not have even been necessary as they used it. They may have just chose to use a smaller mat inside vestibule that didn't go over the—the ramp. That would have made more sense." (Kendzior Dep. at 86:21–87:4.) However, Plaintiff cannot establish a standard of care from Kendzior's speculation that it would have been safer if Defendant relied solely on the mat at the front door. And in contrast to Kendzior's speculation, one provision in the relevant standards anticipates the use of multiple mats in wet weather. (*See* Standards at 13 ("As a rule of thumb, footprints or water prints should not be seen on the floor beyond the last mat of an installation.").)

15

and there is no record evidence that this particular mat migrated at all, let alone a considerable distance.[10]

The court, having dispensed with the proffered standards, finds that Kendzior's "experience and knowledge of the floor mat industry," standing alone, does not constitute a "specific, articulable (and articulated) standard of care." *Frazza*, 529 F. Supp. 2d at 73 ("However, an expert cannot rely upon 'his own experience and on anecdotal observations to form an opinion' because these things fail 'to provide any basis . . . by which *the jury* could determine what the standard of care was and how [Defendant's] conduct deviated from it.'" (alterations in original) (quoting *District of Columbia v. Carmichael*, 577 A.2d 312, 315–16 (D.C. 1990))). In addition, in an abundance of caution, the court reviewed several scenarios in the Standards in which mats should be secured. (*See* Standards at 14, 15, 19, 20.) Having conducted its review, the court agrees with Kendzior, (*see* Kendzior Dep. at 74:22–75:11), that there is no Standard precluding Defendant from using the mat in the manner that it did.

Accordingly, the court cannot find that Plaintiff, given the facts of this case, has met her burden in establishing an applicable standard of care. "If the standard itself is not proven, then a deviation from that standard is incapable of proof." *Carmichael*, 577 A.2d at 314.

---

[10] In his deposition, Kendzior stated: "The mat might have originally been installed—well, in this case if you look at the surveillance video, there's this big gap between the end of the mat and the threshold of the door. Well, most likely the mat was installed to be closer to the threshold. But people coming and leaving, moving back and forth, the mat moves around. It's very common. That's not a criticism. That's just the nature of floor mats. You'll see it in grocery stores where people are pushing carts and if you speed up the video—you ought to watch it. If you speed up the video, the mat's moving around the—the vestibule under cart traffic." (Kendzior Dep. at 84:6–20.) There is no evidence in the record that Kendzior sped up the video here and noticed any mat movement, thus the court cannot credit this speculative statement.

## IV. CONCLUSION

For the foregoing reasons, the court will deny Plaintiff's motions for leave to file a surreply, grant Defendant's motion to exclude expert testimony, and grant Defendant's motion for summary judgment.

A corresponding order will issue separately.

Date: October 16, 2019

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge